## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

JAMES B. WOLF, JR.,                          Case No. 04-73509
                                             Hon Gerald E. Rosen

      Debtor.

_____/

DETROIT FORMING, INC.,                       Bankruptcy Case No. 03-40873-R
                                             Hon. Steven W. Rhodes
          Plaintiff-Appellee,               Chapter 7

          v.                                 Adversary Case No. 03-4274

JAMES B. WOLF, JR.,

          Defendant-Appellant.

_____/

## OPINION AND ORDER AFFIRMING BANKRUPTCY
## COURT'S OPINION AND JUDGMENT OF NONDISCHARGEABILITY

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on_____September 14, 2005_____

PRESENT:  Honorable Gerald E. Rosen
               United States District Judge

In the present appeal arising from a Chapter 7 bankruptcy proceeding, Debtor

James B. Wolf, Jr. challenges the Bankruptcy Court's August 25, 2004 ruling that a state

court judgment in favor of Plaintiff/Appellee Detroit Forming, Inc. and against Debtor

was nondischargeable.  Following a trial on this matter, the Bankruptcy Court issued a

thorough nine-page opinion holding that the state court judgment reflected a "willful and malicious injury" inflicted by Debtor upon the Plaintiff corporation, and hence was exempt from discharge under 11 U.S.C. § 523(a)(6).

Having reviewed the parties' written submissions and the pertinent portions of the record on appeal, the Court finds that oral argument would not significantly aid the decisional process, and that it is appropriate to resolve this appeal on the briefs. For the reasons set forth below, the Court affirms the Bankruptcy Court's ruling in all respects.

## I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Debtor/Appellant James B. Wolf, Jr. was a longstanding employee of Plaintiff/Appellee Detroit Forming, Inc., a family-owned manufacturing company located in Southfield, Michigan. The company's founder, James Rodney, now serves as its CEO, while his son, Leigh Rodney, is the president and is responsible for the day-to-day operations of the business. Debtor served as the company's controller from 1991 until May of 1998. His departure from the company was contentious, however, and formed the subject of the state court litigation at the heart of the present appeal.

Shortly before the termination of his employment with the Plaintiff company in May of 1998, Debtor had taken some time off from work, believing that this time was being charged against his disability leave. Upon returning from this leave, however, he requested a vacation day and was told that he had exhausted his vacation time as a result of his recent absences. When Debtor complained about this to Leigh Rodney, he was told to meet with James Rodney to discuss the matter.

2

Accordingly, Debtor met with James Rodney on or around May 20, 1998 to discuss this matter.  During the meeting, Debtor expressed his view that he had been treated differently from other employees with respect to leave and vacation time, and he speculated that this was the result of his "great reluctance" to go along with certain tax-avoidance schemes allegedly employed by the Plaintiff company that Debtor viewed as "fraudulent."  (4/22/2004 Trial Tr. at 112-13.)  Although Debtor denied any intention to convey any sort of threat during this meeting, James Rodney testified before the Bankruptcy Court that he perceived a threat in Debtor's remarks:

> [Debtor] originally brought up the problem that he felt he should have more time off as paid vacation time, and Leigh Rodney didn't seem willing to grant it to him.  And then he stated that his request was within our stipulated rules, and I said, well, that would be no problem at all if it was within our stipulated rules, and there was no argument.  He'd have the time off.  Then he didn't seem satisfied with that response, and he brought some vague accusation of tax fraud on the part of Leigh Rodney and that if he didn't get what he wanted, he knew what to do about that.  And that was — came as quite a shock to me.  I had no intimation of anything like that or knowledge of it.  And I told him that we weren't having the meeting — I didn't have the meeting with him in order to be threatened and that certainly I'd investigate anything like that, but I wasn't going to sit there and be threatened by him and that I thought we should end the meeting.

(Id. at 19.)

Following this meeting, James Rodney looked into Debtor's allegations of tax fraud and concluded that they were unfounded.  Nonetheless, James and Leigh Rodney decided to meet with Debtor in order to "find out just what was on [his] mind, what the reasons for his actions and his dissatisfaction and his charges were and why we should have such a misunderstanding with him."  (Id. at 21.)  Accordingly, a meeting was

scheduled for May 28, 1998,[1] and Debtor was asked, in advance of this meeting, to document his allegations of a fraudulent tax scheme.

In the view of James and Leigh Rodney, Debtor arrived at the meeting with an antagonistic attitude, and it appeared unlikely that the parties would be able to resolve their differences. In addition, Debtor had not prepared a written statement setting forth his allegations of tax fraud,[2] and he provided no further details at the meeting. Once it became clear that the employment relationship had deteriorated beyond repair, the discussion turned to a separation agreement, and Debtor stated his understanding that he would continue working until such an agreement could be reached. Debtor also promised to prepare a written job description and to document his tax fraud concerns.

Debtor left the premises shortly after this meeting, and did not return to work at the Plaintiff company.[3] In Debtor's view, he had been fired, but Plaintiff maintains that Debtor voluntarily quit his position. The company sent Debtor a proposed severance agreement, apparently offering three months of severance pay, but Debtor declined to execute this agreement. Instead, an attorney sent a letter to the company on Debtor's behalf, stating Debtor's belief that he had been unlawfully fired for refusing to participate

---

[1]Debtor requested that another employee be present as a witness at the meeting, but the Rodneys instead suggested, and Debtor agreed, that the meeting should be tape-recorded. The parties apparently agree that the transcript of this tape-recorded May 28 meeting is largely accurate, and the transcript was admitted as a trial exhibit in the court below.

[2]Debtor also had been asked to prepare written job descriptions for his position and for the employees who reported to him, but he had not yet done so.

[3]Debtor never provided the written materials requested by the Rodneys.

in a fraudulent tax-avoidance scheme.  Leigh Rodney responded, through counsel, by advising Debtor's attorney that the company would offer no more than the severance package previously proposed to Debtor.

Nearly a year later, on February 25, 1999, Debtor commenced an action against the Plaintiff corporation in Oakland County Circuit Court, asserting state-law claims of unlawful termination in violation of public policy, breach of contract, and disability discrimination.  Plaintiff's initial motion for summary disposition was granted in part and denied in part, leaving only Debtor's public policy claim for trial.  The matter then was referred for mandatory case evaluation in accordance with Michigan Court Rule 2.403(A), and the mediation panel recommended a settlement amount of $40,000. Plaintiff accepted the panel's recommendation, but Debtor rejected it.  Accordingly, the case proceeded to trial.

Shortly before the state court trial commenced in September of 2001, Debtor's trial counsel, Gerald Wahl, sent a letter to Plaintiff's counsel stating in pertinent part:

> [P]lease find enclosed four letters, with a copy of the attachment being sent to each, which I intend to send in the afternoon of **September 4, 2001,** after our Settlement Conference.  You may wish to discuss the contents of these letters, and the attachment, with your client.

(Record on Appeal, Ex. 12, Wahl 8/28/2001 Letter.)  The referenced letters were addressed to four different taxing authorities in Michigan, Illinois, and California, quoted from Leigh Rodney's deposition testimony in the state court litigation, and stated Debtor's opinions (i) that "the reason he was terminated from his employment was the

5

willingness to engage in, design of, and subsequent execution of, questionable tax practices," and (ii) that the Plaintiff corporation had prepared property lists "which showed the location of property and taxes in states with lower property tax rates, . . . instead of the states where the property and/or equipment were actually located." (Record on Appeal, Ex. 14, Plaintiff's Responses to Defendant's Interrogatories and Request for Documents.) The letters also notified these taxing authorities about the upcoming trial, and asked the authorities to "[p]lease advise as to any steps you are taking to investigate the facts known by [Debtor] and testified to by Mr. Rodney." (Id.)[4]

At the ensuing state court trial, a jury returned a verdict in favor of the Plaintiff corporation and against Debtor. Plaintiff then filed a motion for mediation sanctions under the Michigan Court Rule governing case evaluation, which provides that a party who rejects a case evaluation "must pay the opposing party's actual costs unless the verdict is more favorable to the rejecting party than the case evaluation." Mich. Court Rule 2.403(O)(1). The state court granted this motion, ordering Debtor to pay Plaintiff $80,000 in attorney fees and costs.

Debtor filed for voluntary Chapter 7 bankruptcy protection on January 13, 2003, listing the $80,000 state court award to Plaintiff as a business debt. Plaintiff then commenced an adversary proceeding, contending that the $80,000 award should not be

---

[4]Attorney Wahl testified before the Bankruptcy Court that these letters were, in fact, sent out to the various taxing authorities, and that the treasurer of Kane County, Illinois followed up by calling to inquire about the status of Debtor's case against Plaintiff.

discharged in bankruptcy as it reflected a "willful and malicious injury by the debtor" within the meaning of 11 U.S.C. § 523(a)(6). The matter proceeded to trial on April 22, 2004, with the Bankruptcy Court hearing the testimony of Debtor, his state court attorney Gerald Wahl, and James and Leigh Rodney. On August 25, 2004, the Bankruptcy Court issued an opinion and judgment in Plaintiff's favor, finding that the $80,000 debt owed by Debtor to Plaintiff was nondischargeable under § 523(a)(6). Debtor now appeals.

## II. <u>ANALYSIS</u>

**A.     The Standards Governing This Appeal**

In the present appeal, Debtor challenges both the Bankruptcy Court's legal determinations and its factual findings. "The appropriate standard of review of the bankruptcy court's conclusions of law is *de novo*." <u>First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Financial Services, Inc.)</u>, 974 F.2d 712, 717 (6th Cir. 1992). In contrast, "[f]indings of fact entered by the bankruptcy court will not be set aside unless clearly erroneous," with "due regard" given to "the opportunity of the bankruptcy court to judge the credibility of the witnesses." 974 F.2d at 716 (quoting Bankruptcy Rule 8013).

**B.      The Bankruptcy Court Did Not Err in Allowing Plaintiff to Challenge the Dischargeability of the $80,000 State Court Award under 11 U.S.C. § 523(a)(6).**

Apart from challenging the factual basis for the Bankruptcy Court's ruling, Debtor contends as a threshold matter that the state court's award of $80,000 in attorney fees and costs is not the proper subject of a claim of nondischargeability under 11 U.S.C. § 523(a)(6). In particular, Debtor argues that Plaintiff's claim of nondischargeability suffers from two legal defects: (i) it purportedly rests upon a theory of "blackmail" that is not a cognizable basis for a common-law claim or an award of attorney fees under Michigan law; and (ii) it purportedly is based, at least in part, upon the conduct of someone other than Debtor himself — namely, his state court attorney, Gerald Wahl. The Court finds no merit in either of these challenges.

In support of the first of his two claims of legal error in the Bankruptcy Court's ruling, Debtor points to the Bankruptcy Code provision stating that a claim against a bankruptcy estate must be disallowed to the extent that it is "unenforceable against the debtor . . . under . . . applicable law." 11 U.S.C. § 502(b)(1). Debtor then cites the Bankruptcy Court's findings (i) that Debtor "intended to blackmail" Plaintiff, (ii) that the state court litigation was part of this blackmail scheme, and (iii) that, as a result, Plaintiff incurred $80,000 in attorney fees and expenses as reflected in the state court's award of mediation sanctions. (Bankruptcy Court 8/25/2004 Op. at 8-9.) In view of these findings, Debtor surmises that Plaintiff's claim in this case rests upon a theory of blackmail. Yet, to the extent that a common-law claim of blackmail or extortion might be cognizable in

8

Michigan, Debtor contends that the elements of such a claim have not been proven here, and that, in any event, attorney fees would not be recoverable as damages under such a theory.  It follows, in Debtor's view, that Plaintiff's claim should be disallowed as unenforceable under the "applicable law" of the State of Michigan.

This argument, however, conflates two separate and distinct legal inquiries:  (i) whether a claim is enforceable against the debtor under "applicable law," as a prerequisite to its allowance under § 502(b), and (ii) whether the debt that underlies this claim reflects a "willful and malicious injury by the debtor," such that the debt is exempt from discharge under § 523(a)(6).  As to the first of these questions, a state court judgment clearly is enforceable under the "applicable law" of that state.  More importantly, it is equally clear — and, in fact, Debtor expressly acknowledges in his brief on appeal, (see Debtor's Appeal Br. at 5) — that an award of attorney fees and costs under Michigan's case evaluation sanction provision, Mich. Court Rule 2.403(O), is valid and fully enforceable under Michigan law.  Surely, if Debtor had never filed for bankruptcy protection, there could be no doubt as to the enforceability of the state court's attorney fee award or Plaintiff's right to collect upon this award.  It follows that § 502(b)(1) poses no obstacle to the allowance of Plaintiff's claim in bankruptcy, as this provision mandates the disallowance only of those claims that "would not be enforceable against the debtor outside of bankruptcy."  United States v. Sanford (In re Sanford), 979 F.2d 1511, 1513 (11th Cir. 1992).

That being the case, the Bankruptcy Court's *subsequent* finding that the state court

9

litigation was part of a blackmail scheme cannot possibly affect the enforceability of the antecedent state court award under Michigan law, and hence has no bearing upon the possible allowance of Plaintiff's claim under § 502(b)(1).  Rather, this finding is relevant only to the **second** of the above-cited inquiries — namely, whether the debt arising from the state court's attorney fee award should be exempt from discharge as the product of a "willful and malicious injury by the debtor" within the meaning of § 523(a)(6).  This issue simply was never decided, one way or the other, in the state court proceedings.  As all are agreed, questions of malicious intent are immaterial to a Michigan court's determination whether to award fees and costs as a mediation sanction — such an award is mandatory whenever a party rejects a case evaluation and then fails to obtain a verdict more favorable than the rejected evaluation.  See Mich. Court Rule 2.403(O)(1).

Thus, as Bankruptcy Court properly recognized, it was starting afresh in resolving Plaintiff's claim of nondischargeability under § 523(a)(6).  The state court's ruling and award of mediation sanctions had no preclusive effect upon this inquiry, because it was unnecessary for the state court to ascertain whether Debtor commenced the state court litigation maliciously or for an improper purpose in order to award mediation sanctions under Mich. Court Rule 2.403(O).  Compare Abbo v. Rossi, McCreery & Associates, Inc. (In re Abbo), 168 F.3d 930, 931 (6th Cir. 1999) (holding that a state court judgment in a malicious prosecution suit was entitled to preclusive effect in a subsequent bankruptcy proceeding under § 523(a)(6)).  By the same token, it was not necessary for Plaintiff to raise the issue of Debtor's intent before the state court, or for the state court itself to

10

weigh in on this matter, in order for the Bankruptcy Court to entertain this question in an adversary proceeding brought under § 523(a)(6).  See Brown v. Felsen, 442 U.S.127, 134-39, 99 S. Ct. 2205, 2211-13 (1979); Whitson v. Middleton, 898 F.2d 950, 953 (4th Cir. 1990); E.L. Hamm & Associates, Inc. v. Sparrow (In re Sparrow), 306 B.R. 812, 846-47 (Bankr. E.D. Va. 2003).

Rather, it was entirely appropriate for the Bankruptcy Court to look to the state court award solely for the purpose of establishing the amount of fees and expenses incurred by Plaintiff in the state court litigation, and then to determine for itself, as a matter of federal bankruptcy law, whether these fees and expenses were the product of a "willful and malicious injury" inflicted by Debtor.  In so doing, the Bankruptcy Court did not somehow transform the state court's award of mediation sanctions into an award of damages for a common-law claim of blackmail.  Instead, it found that this award, however justified as a matter of state law, reflected an injury suffered by Plaintiff as a result of a blackmail scheme that triggered nondischargeability under § 523(a)(6). Accordingly, the Court rejects Debtor's contention that the Bankruptcy Court should have disallowed Plaintiff's claim under § 502(b)(1).

Nor can the Court accept Debtor's assertion that the Bankruptcy Court committed legal error by considering the actions of Debtor's state court counsel as part of its § 523(a)(6) inquiry.  As noted by Debtor, § 523(a)(6) is triggered by "willful and malicious injury *by the debtor*," 11 U.S.C. § 523(a)(6) (emphasis added), leading some courts to conclude that "a person's willful and malicious actions cannot be imputed to another

11

person for the purpose of holding [a] debt nondischargeable under § 523(a)(6)."  O'Brien
v. Sintobin (In re Sintobin), 253 B.R. 826, 830 (Bankr. N.D. Ohio 2000) (citing cases).  In
Debtor's view, the Bankruptcy Court violated this principle by relying on the actions of his
state court attorney, Gerald Wahl, in finding that the state court litigation was part of a
blackmail scheme that inflicted "willful and malicious injury" upon the Plaintiff
corporation.  Specifically, the Bankruptcy Court cited Wahl's trial testimony and his
August 28, 2001 letter to Plaintiff's counsel — *i.e.,* the letter in which Wahl stated that
letters would be sent to various taxing authorities if the parties did not settle the state
court litigation — as the "strongest evidence" of Debtor's intent to blackmail Plaintiff.
(See Bankruptcy Court 8/25/2004 Op. at 7.)

　　　Yet, Debtor's argument on this point overlooks the important distinction between
imputing the malicious acts of the attorney/agent to the client/principal, on one hand, and
looking to the actions of an attorney as ***evidence*** of a client's willful and malicious intent,
on the other.  The Bankruptcy Court held that ***Debtor***, and not his attorney, had engaged
in willful and malicious conduct by attempting to blackmail Plaintiff.  The Bankruptcy
Court further concluded that ***Debtor*** commenced the state court litigation to advance this
blackmail scheme, after his previous attempts to extract payment from Plaintiff had
failed.  As ***proof*** of this scheme, the Bankruptcy Court cited, among other evidence, the
testimony of and letters sent by Debtor's state court counsel.

　　　Surely, the conduct of counsel during litigation serves as probative evidence of the
client's intent in pursuing this litigation.  It has long been established, after all, that a

12

"party is deemed bound by the acts of his lawyer-agent." Link v. Wabash Railroad Co., 370 U.S. 626, 634, 82 S. Ct. 1386, 1390 (1962); see also Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership, 507 U.S. 380, 396-97, 113 S. Ct. 1489, 1499 (1993) (applying this rule in a bankruptcy proceeding); Shaw v. Shaw (In re Shaw), 210 B.R. 992, 996 (Bankr. W.D. Mich. 1997) (applying this rule in a nondischargeability proceeding under § 523(a)(6)). At a minimum, then, it is permissible to infer, as the Bankruptcy Court did here, that an attorney is acting in accordance with the wishes of his client.

Moreover, Debtor himself acknowledges, and the case law confirms, that damage awards in malicious prosecution suits and awards of attorney fees as litigation sanctions may be held nondischargeable in a subsequent bankruptcy proceeding, so long as the usual prerequisites for nondischargeability are met. See, e.g., In re Abbo, 168 F.3d at 931; Spring Works, Inc. v. Sarff (In re Sarff), 242 B.R. 620, 628 (B.A.P. 6th Cir. 2000); Cox v. Bast (In re Bast), 212 B.R. 499, 504-05 (Bankr. D. Md. 1997), aff'd, 178 F.3d 1282 (4th Cir. 1999). Presumably, the debtors in most or all of these cases were represented by counsel in the underlying litigation in which the damages or sanctions were awarded, and yet the courts placed no significance on this in making their dischargeability determinations. Rather, the courts in these cases seemingly assumed, absent a basis to conclude otherwise, that the debtor and his or her counsel were acting with a unified interest in the underlying litigation in which the debt was incurred.

To be sure, a debtor can attempt to establish, as Debtor did here, that his counsel

13

acted without his authorization or knowledge in pursuing a particular course of action.

Yet, such an argument goes only to the weight of the evidence of counsel's conduct, and

does not altogether preclude the consideration of such evidence.  The Bankruptcy Court

need not accept such a factual assertion, and the lower court here did not.  Whether or not

the Bankruptcy Court's factual findings on this point were erroneous — a question

addressed below — no legal error was committed through the Bankruptcy Court's

reliance on the actions of Debtor's counsel in determining the dischargeability of the state

court's attorney fee award.

**C.     The Bankruptcy Court's Factual Finding of a "Willful and Malicious Injury" Is Not Clearly Erroneous.**

Apart from his claims of legal error in the proceedings below, Debtor further

asserts that the Bankruptcy Court erred in its factual finding that the state court award of

$80,000 in attorney fees was nondischargeable under § 523(a)(6) as the product of

Debtor's "willful and malicious" conduct.  As noted earlier, a Bankruptcy Court's factual

findings will be upheld unless clearly erroneous, and "due regard" must be given to "the

opportunity of the bankruptcy court to judge the credibility of the witnesses."  In re Baker

& Getty Financial Services, 974 F.2d at 716 (quoting Bankruptcy Rule 8013).  Applying

this standard here, the Court discerns no basis to disturb the Bankruptcy Court's findings.

In challenging the Bankruptcy Court's determination of nondischargeability,

Debtor contends that no credible evidence was introduced in the court below of his intent

to injure Plaintiff, as required to establish a "willful and malicious injury" under §

14

523(a)(6).  See Kawaauhau v. Geiger, 523 U.S. 57, 61-62, 118 S. Ct. 974, 977 (1998).  In

Debtor's view, the only arguable evidence of such intent was:  (i) the August 28, 2001

letter from his state court counsel, Gerald Wahl, to Plaintiff's attorney, in which Wahl

stated his intention to notify various taxing authorities about Plaintiff's questionable tax

practices if the parties failed to resolve the state court litigation at their forthcoming

settlement conference; and (ii) James Rodney's testimony regarding his meeting with

Debtor in May of 1998, during which, in Rodney's view, Debtor accused Leigh Rodney

of engaging in tax fraud and threatened to act upon this information.  Debtor argues that

this evidence fails to support the Bankruptcy Court's determination that he engaged in a

blackmail scheme with the intent to injure Plaintiff.

This argument, however, understates both the significance and the extent of the

evidence introduced at trial.  Regarding attorney Wahl's August 28, 2001 letter, there is

no denying the highly damaging significance of its explicit link between a possible

settlement and a threatened report of fraud to the taxing authorities.  Certainly, this letter

alone provides ample support for the conclusion that the state court litigation was being

pursued for the improper purpose of extracting a settlement payment from Plaintiff, as

opposed to the legitimate purpose of challenging the legality of Plaintiff's termination of

Debtor's employment.[5]

---

[5]As noted by the Bankruptcy Court, this conclusion finds further support in Wahl's
testimony regarding the purportedly legitimate purpose behind his letter.  In particular, Wahl
explained that he sent the letter to "protect my client" in advance of the forthcoming state court
trial, opining that he "couldn't have [Debtor] go in front of a jury and say we didn't do anything
with th[e] information" regarding Plaintiff's alleged tax fraud.  (4/22/2004 Trial Tr. at 103.)  The

Indeed, Debtor seemingly recognizes as much, seeking to distance himself from the actions of his attorney by denying any knowledge of Wahl's August 28, 2001 letter. As explained earlier, however, the Bankruptcy Court was not required to accept this assertion, so long as it identified a sufficient basis for discounting Debtor's and Wahl's testimony on this point.  Regarding Wahl, the Bankruptcy Court found his testimony regarding the August 28 letter to be "incredulous," (Bankruptcy Court 8/25/2004 Op. at 7), and such credibility assessments lie uniquely within the province of the trial court.  In addition, Wahl did not deny that the strategy behind the letter reflected his client's wishes, but merely testified that he did not provide Debtor with a copy of the letter or discuss it with him at the time it was sent.  (See 4/22/2004 Trial Tr. at 103.)[6]

Similarly, Debtor did not expressly disavow the strategy behind his attorney's letter.  Instead, he more broadly denied that he ever threatened to report Plaintiff to any taxing authority if they did not pay him to settle the state court lawsuit, or that he had ever instructed his state court counsel to pursue such a course of action.  (See id. at 110-11.) Depending, of course, upon Debtor's notion of a "threat" — a topic discussed below —

---

Bankruptcy Court termed this testimony "incredulous," (Bankruptcy Court 8/25/2004 Op. at 7), and this Court likewise confesses its inability to perceive how a report to taxing authorities on the eve of the state court trial in September of 2001 could advance Debtor's claim that he was illegally fired over *three years earlier,* in May of 1998, for refusing to participate in Plaintiff's allegedly fraudulent tax-avoidance scheme.  The sheer implausibility of Wahl's explanation seemingly undermines any suggestion that his letter was intended to serve a legitimate purpose.

[6]Significantly, one aspect of Debtor's testimony appears contradictory to Wahl's testimony on this point, as Debtor stated that he "typically" received copies of correspondence sent by his attorneys during the course of the state court litigation.  (Id. at 121.)

16

this testimony does not necessarily reflect a disavowal of or distancing from the statements made in Wahl's letter. And, again, the Bankruptcy Court was not compelled to accept Debtor's testimony on this subject, in light of its determinations that Debtor's testimony as to his intent was not "persuasive," and that his testimony in general was less than credible in light of its inconsistency with certain aspects of the undisputed written record. (See Bankruptcy Court 8/25/2004 Op. at 7-8.) Under this record, the Court fails to discern any clear error in the Bankruptcy Court's finding that Wahl's letter constituted "strong evidence" of Debtor's malicious intent in pursuing the state court litigation.

In any event, this letter was not the only evidence of an improper purpose behind the state court litigation. Rather, as observed by the Bankruptcy Court, Leigh Rodney testified that he "frequently" heard from his attorney throughout the litigation about "repeated[]" calls from Debtor's counsel to "remind[] us of the difficulties we could have with the fraud charges" and to inquire about Rodney's interest in negotiating a settlement. (4/22/2004 Trial Tr. at 53.)[7] In addition, two of the three counts of Debtor's state court complaint were dismissed early in the proceedings, and a jury returned a verdict of no cause of action on the remaining count. This lack of success lends further support to (albeit does not compel) the Bankruptcy Court's conclusion that the state court suit was

---

[7]Notably, Gerald Wahl testified that he first became involved in the state court litigation in August of 2001, shortly before trial. It presumably follows, then, that at least some of the contacts referred to in Leigh Rodney's testimony were initiated by an attorney other than Wahl. If two different attorneys representing Debtor and acting on his behalf employed a similar strategy of explicitly linking settlement negotiations to potential charges of tax fraud, it is all the more reasonable to infer that the attorneys acted with Debtor's knowledge and in accordance with his wishes.

17

filed as part of Debtor's overall effort to extort a settlement from Plaintiff.

More generally, this evidence of Debtor's intent during the state court litigation must be considered in light of the actions that preceded the litigation. This leads the Court to the second piece of evidence addressed in Debtor's brief on appeal — *i.e.,* James Rodney's testimony regarding a perceived threat made by Debtor during a meeting in May of 1998. In particular, Rodney testified that Debtor raised a "vague accusation of tax fraud on the part of Leigh Rodney" during this meeting, and then stated "that if he didn't get what he wanted, he knew what to do about that." (4/22/2004 Trial Tr. at 19.) In Debtor's view, this testimony is insufficient to support the Bankruptcy Court's finding that he intended to blackmail Plaintiff, particularly in light of his own testimony denying that he ever engaged in blackmail.

This Court finds that the record is more than adequate to support the Bankruptcy Court's finding. First, James Rodney expressly testified as to his own view that Debtor had made a threat during their meeting in May of 1998; indeed, Rodney testified that he said as much during the meeting itself, telling Debtor that he "didn't have the meeting with him in order to be threatened," and that "I wasn't going to sit there and be threatened by him." (Id. at 19.) As noted by the Bankruptcy Court, this testimony reveals that Debtor was explicitly advised by James Rodney that he appeared to be making a threat, and yet he did nothing to dispel this impression, either at the time or during his subsequent meeting with James and Leigh Rodney. Moreover, upon hearing Rodney's testimony that he perceived a threat in Debtor's remarks and Debtor's testimony denying

18

that he had made any such threat, the Bankruptcy Court was entitled to resolve this conflicting testimony by, on the one hand, judging Rodney to be a "very credible witness," and then finding, on the other hand, that Debtor's credibility was undermined by various inconsistencies in his testimony. (Bankruptcy Court 8/25/2004 Op. at 6, 8.)

Finally, it again bears emphasis that James Rodney's testimony does not stand in isolation on this point. Most significantly, the trial testimony regarding the May 28, 1998 meeting between Debtor and the Rodneys, as well as the transcript of the meeting itself, provide additional support for the Bankruptcy Court's findings. Given Debtor's allegations of tax fraud during his earlier meeting with James Rodney, the Rodneys not surprisingly requested that Debtor supply additional details in support of these allegations. Yet, the Rodneys testified, and the meeting transcript confirms, that Debtor failed to elaborate upon his suggestions of fraud. Instead, he arrived at the meeting with an antagonistic attitude, and seemingly invited the Rodneys to terminate his employment. At this point, the parties apparently were in agreement that Debtor would cease to work for the Plaintiff corporation, and Debtor expressed his willingness to remain on the job for a brief transitional period while the parties negotiated a severance agreement. Instead, however, Debtor left the workplace shortly thereafter and did not return, with his next communication coming in the form of a letter from his attorney alleging that Debtor had been improperly terminated for refusing to participate in tax fraud.

This evidence, to be sure, could be viewed in a number of ways, and does not ineluctably lead to the conclusion reached by the Bankruptcy Court. Yet, it is fully

19

consistent with that conclusion, and therefore cannot provide the basis for overturning the factual findings of the court below.  Particularly when viewed in the light of the record as a whole, the testimony regarding the parties' May 28, 1998 meeting lends support to the Bankruptcy Court's determination that Debtor intended to inflict an injury upon and extract a settlement from Plaintiff, as opposed to engaging in a good faith effort to prevent or oppose a questionable tax-avoidance scheme.  This finding, in turn, lends further support to the Bankruptcy Court's overarching determination that Debtor intended to blackmail Plaintiff, and that the state court litigation was part of this effort.  Because these findings are not clearly erroneous, this Court affirms the Bankruptcy Court's ruling that the state court's $80,000 attorney fee award is nondischargeable under § 523(a)(6) as the product of Debtor's willful and malicious conduct.

### III.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Bankruptcy Court's August 25, 2004 Opinion and corresponding Judgment are AFFIRMED.


s/Gerald E. Rosen_____
Gerald E. Rosen
United States District Judge

Dated:  September 14, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record

20

on September 14, 2005, by electronic and/or ordinary mail.

                         s/LaShawn R. Saulsberry           
                         Case Manager